UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN J MACLAUGHLAN, individually and on behalf of all others similarly situated, | : |
| Plaintiff, | : Civil Action No.: |
| v. | : Sorokin |
| CLEAR CHANNEL COMMUNICATIONS, INC., CLEAR CHANNEL BROADCASTING, INC., and LIVE NATION, INC., | : JURY TRIAL DEMANDED |
| Defendants. | : |

## CLASS ACTION COMPLAINT

Plaintiff Kevin J MacLaughlan ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following facts and claims upon knowledge as to matters relating to himself, and upon information and belief as to all other matters against Defendants Clear Channel Communications, Inc., Clear Channel Broadcasting, Inc., and Live Nation, Inc. (collectively "Clear Channel" or "Defendants"):

### INTRODUCTION

1.   This class action complaint is brought on behalf of all persons or entities who purchased tickets to live rock concerts promoted by Defendants between June 13, 1998 and December 21, 2005 in Boston and the surrounding areas in Massachusetts, Rhode Island, Connecticut, New Hampshire, Vermont and Maine (the "Massachusetts Region"). On behalf of the Class (defined below), Plaintiff seeks monetary, declaratory and injunctive relief due to harm caused by Defendants' monopolization, attempted monopolization, and other anticompetitive practices in the Market for rock concert promotion.

2. This class action lawsuit arises out of Defendants' unlawful and anticompetitive scheme to obtain, maintain, and leverage monopoly power in the Massachusetts Regional concert promotion market, resulting in artificially inflated concert ticket prices and unlawful profits for Defendants at the expense of Plaintiff and the Class.

3. In short, through mergers and other anticompetitive and predatory practices, Defendants have used their dominant position in the radio market to leverage their position in the rock concert promotion market, with the effect of lessening competition and increasing concert ticket prices for Plaintiff and the Class.

4. Beginning around 1996, when Congress eliminated certain restrictions on radio station ownership through the Communications Act of 1996, Clear Channel Communications, Inc. began building a media empire at breakneck speed through a series of acquisitions or radio stations and related entities. Since 1996, the Clear Channel chain has grown from 40 radio stations to approximately 1,200 and is now that largest radio broadcasting company in the county.

5. As part of its acquisition scheme, Clear Channel Communications, Inc., through its subsidiaries, also quickly became the nation's largest concert promoter. Clear Channel promotes or produces more than 26,000 live entertainment events per year; owns approximately 120 live entertainment venues; and controls 900 music-related websites, 19 television stations, and more than 700,000 outdoor- advertising displays.

6. Using its ability to control radio airplay and advertising, which are both essential to successful concert promotion, Clear Channel has engaged in anticompetitive conduct, described more fully below, that has severely curtailed competition in concert promotion, resulting in increased concert tickets prices for Plaintiff and the Class.

2

7. Defendants anticompetitive conduct includes the following, as examples:

- Limiting radio airplay of artists who refuse to use Clear Channel's concert promotion services;

- Denying promotional air-time to artists who use competing promoters;

- Refusing to accept advertising by other concert promoters, charging excess fees for such advertising, or limiting such advertising to undesirable time slots;

- Excluding concerts promoted by competitors from radio updates of upcoming concerts; and

- Inflating fees paid to artists, in some cases more than 100% of gross sales, in order to exclude competitors from the market.

8. Much of the conduct described in this complaint was the subject of an antitrust investigation initiated by the Department of Justice in July 2003 concerning alleged tying of radio airplay or the use of certain concert venues to the use of Defendants' concert promotion services. The Department of Justice agreed to discontinue the investigation in February 2006, reportedly because Clear Channel Communications, Inc. agreed to spin-off its concert promotion arm, Live Nation, to become a separately owned company. However, Live Nation and Clear Channel Communications, Inc. both continue to be dominated by the same individuals.

9. In 2002, a class action titled *Heerwagen v. Clear Channel Communications, Inc.*, No. 02-cv-4503 (SDNY), was filed against certain of the Defendants in the United State District Court for the Southern District of New York on behalf of a nationwide class of concert ticket purchasers. Plaintiff and the Class, here, would have been members of that putative nationwide class. However, in August 2003 the *Heerwagen* Court found that the relevant market for concert tickets was local, rather than national, and denied a motion for class certification. The District Court's decision was affirmed by the Second Circuit on January 10, 2006. *Heerwagen v. Clear*

*Channel Communications*, 435 F.3d 219 (2d Cir. 2006). Accordingly, Plaintiff files this class action on behalf of rock concert ticket purchasers in the local, regional market.

10. Defendants' anticompetitive conduct has resulted in inflated concert ticket prices and deprived Plaintiff and the Class of the benefits of a competitive market. For example, according to Princeton University Economics Professor Alan B. Krueger, between 1997 and 2002, the period during which Clear Channel Communications Inc. grew to its mammoth size, U.S. concert ticket prices rose 61 percent. However, between 1991 and 1996, just before Clear Channel's explosive growth, ticket prices rose only 21 percent. *See* Alan B. Krueger, *How Much is Too Much? The Economics of Concert Ticket Prices,* Keynote Address at the Concert Industry Consortium 2002 (Feb. 7, 2002). By comparison, the consumer price index increased 13 percent between 1997 and 2002, and 15 percent between 1991 and 1996.

11. Plaintiff seeks damages and injunctive relief on behalf of the Class.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the claims relating to violations of Section 2 of the Sherman Act of 28 U.S.C. § 1331 and 1337 and 15 U.S.C. § 15. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391. Defendants have transacted business within this district and many of the acts and events giving rise to this action occurred within this district.

## PARTIES

14. Plaintiff Kevin J MacLaughlan, a resident of Medford, Massachusetts, purchased tickets to one or more rock concerts promoted by Defendants in the Massachusetts Region during the Class Period, defined below.

4

15. Defendant Clear Channel Communications, Inc. ("CCCI") is a Texas corporation headquartered at 200 East Basse Road, San Antonio, Texas 78209. CCCI is one of the largest radio and entertainment conglomerates in the world.

16. Defendant Clear Channel Broadcasting, Inc. ("CCBI") is a wholly owned subsidiary of CCCI. CCBI is a Nevada corporation headquartered at 200 East Basse Road, San Antonio, Texas 78209. Its four divisions include Clear Channel Radio, Clear Channel Television, Clear Channel Outdoor, and Clear Channel Entertainment. Clear Channel Radio locally operates approximately 1,200 radio stations in 300 markets.

17. Defendant Live Nation Inc. ("Live Nation") is a Delaware corporation headquartered at 9348 Civic Center Drive, Beverly Hills, California 90210. Prior to 2000 Live Nation was independently owned and known as SFX. CCCI acquired SFX in 2000 and SFX changed its name to Clear Channel Entertainment in 2001. In December 2005, Live Nation was spun-off from Clear Channel and became a publicly traded company. Live Nation is one of the world's largest promoters and venue operators for live entertainment events. For the year ended December 31, 2005, Live Nation promoted, produced or hosted over 29,500 events with total attendance nearing 60 million. Live Nation operates one of the largest networks of venues including 119 owned or operated venues. In addition, through equity, booking or similar arrangements Live Nation has the right to book events at 34 additional venues. For the year ended December 31, 2005, Live Nation generated revenues of approximately $2.9 billion, approximately 90% of which resulted from its entertainment promotion business and its owned or operated venues. Although Live Nations is now a separate, publicly owned company, it is dominated and controlled by the same individuals who control CCCI: L.Lowry Mays, Mark P. Mays, and Randall T. Mays.

## INTERSTATE TRADE AND COMMERCE

18. During all or part of the relevant time period Defendants employed, in furtherance of their monopolization and attempt to monopolize, as alleged herein, the United States mails as well as various means of interstate commerce and communication.

19. The illegal monopolization and attempt to monopolize the market for rock concert promotion and tickets alleged herein have substantially affected interstate commerce.

20. As examples, Defendants used the instrumentalities of interstate commerce in order to book performances with performers, and to sell and advertise tickets.

## PRODUCT MARKET / GEOGRAPHIC MARKET

21. The relevant product market is the market for promotion of live concert performances, which includes the right to sell tickets to such events.

22. The relevant geographic market is the "Massachusetts Region" including Boston and the surrounding areas in Massachusetts, Rhode Island, Connecticut, New Hampshire, Vermont and Maine.

## THE CONCERT PROMOTION MARKET

23. Typically, to initiate live entertainment events or tours, booking agents directly contract with performers to represent them for defined periods. Booking agents then contact promoters, who will contract with them or directly with performers to arrange events. Booking agents generally receive fixed or percentage fees from performers for their services.

24. Music concert promoters are in the business of planning and promoting music concerts for the ticket-purchasing public. Specifically, a concert promoter bids on a particular musician or band in order to obtain the right to promote the artist's concert. The concert promoter then arranges for the venue, ticketing, and advertising, among other things. Concert promoters

advertise concerts using radio, television, billboards, the internet, newspapers, magazines, posters, and flyers.

25. Promoters earn revenues primarily from the sale of tickets, as well as percentages of revenues from concessions. Performers are paid by the promoter under one of several different formulas, which may include fixed guarantees, percentages of ticket sales or the greater of guaranteed amounts or profit sharing payments based on gross ticket revenues. In addition, promoters may also reimburse performers for certain costs of production, such as sound and lights. Under guaranteed payment formulas, promoters assume the risks of unprofitable events. Promoters may renegotiate lower guarantees or cancel events because of insufficient ticket sales in order to reduce their losses. Promoters can also reduce the risk of losses by entering into global or national touring agreements with performers and including the right to offset lower ticket revenue shows with higher performing shows on the tour in the determination of overall artist fees.

26. Artists and promoters both need radio exposure in order to succeed. Artists need radio airplay in order to gain mass exposure. Similarly, concert promoters need radio stations to hype live shows on the air to make sure tickets get sold.

27. Accordingly, radio is by far the important and effective medium for advertising and promoting concerts.

28. Defendants here used their control over radio advertising and air play to leverage control of the concert promotion market, excluding competition and increasing ticket prices.

## CLEAR CHANNEL IN THE RADIO MARKET

29. Prior to 1996, federal law limited the number of radio stations any single company could own nationally or in any regional market. Companies could own only two

stations in any one market and no more than 28 nationwide. In 1996, Congress passed the Telecommunications Act of 1996, which essentially eliminated limits on station ownership. It allows for a broadcaster to own as many as eight stations on either the AM or FM frequencies in a single market.

30. With the passage of the Communications Act of 1996, CCCI engaged in an acquisition spree. In 1996, CCCI bought 49 radio stations. The next year, it bought 70. In 1998, it bought Jacor Communications with 206 radio stations to the tune of $6.5 billion. CCCI bought AMFM in October 1999, including 830 more stations. (To assuage the rumblings of antitrust regulators, Clear Channel quickly sold off an additional 100-plus stations for $4.2 billion.) The next closest radio competitor at the time was Cumulus, which had a relatively paltry 230 stations at the time.

31. The company now owns stations in 247 of the nation's 250 largest radio markets. CCCI consists of what was once seventy separate broadcast companies, owning 10% of the radio stations in the United States. CCCI dominates the Top 40 format and controls 60 percent of rock-radio listening. CCCI is the largest radio broadcasting company in the U.S. with nearly 1200 stations in the U.S. alone. By comparison, the second largest radio company in the U.S. is Cumulus Media Inc. with 306 radio stations in 61 mid-sized U.S. media markets.

32. CCCI, through its broadcasting operations, reaches more than 110 million listeners in the U.S.. It has at least 150 stations in the top 25 geographical markets alone.

33. CCCI owns or controls 9 radio stations in Boston and Hartford alone (each a top 50 market). Upon information and belief CCCI controls numerous other radio stations in the Massachusetts area as well.

8

## CLEAR CHANNEL IN THE CONCERT PROMOTION MARKET

34. Prior to 1997, most concert promoters were relatively small, regional concert promoters acting more or less independently.

35. In 1997 the face of the concert promotion market began to change when Live Nation's predecessor, SFX, acquired most of the major independent promoters in the concert promotion business through a multi-billion dollar series of deals.

36. In 2000, a more dramatic consolidation occurred when CCCI acquired SFX, which was rechristened Clear Channel Entertainment in 2001, for approximately $4.4 billion. CCCI instantly became the largest concert producer and entertainment promoter in the nation, and Clear Channel was poised to leverage its positions in both the radio and concert promotion industries to its fullest advantage.

37. CCCI's 2001 Annual Report outlined its monopolistic and anticompetitive path:

> Our recent entry into live entertainment operations allowed us to take advantage of the natural synergies between radio and live music events and to gain immediate industry leadership. **We can now leverage our broadcasting assets to reach listeners who have an affinity for music to promote our live entertainment events and ultimately increase ticket revenue.** Our strategy involves improving operating results driven primarily by our ability to increase the utilization of venues, the number of tickets sold per event, sponsorship opportunities, and radio audiences.

Form 10-K for the Year Ended December 31, 2001, at 8-9 (emphasis added).

38. Through the acquisition of SFX (now know as Live Nation), Clear Channel became the largest promoter of live concerts in the country, as well as the largest radio broadcasting company. CCCI was able to control nearly 70 percent of the nation's live shows and amassed over $8 billion in annual revenue. In 2002, Live Nation sold 30 million event tickets, *23 million more than its closest competitor*. In 2004, Live Nation promoted and/or produced over 28,500 events with attendance at venues *exceeding 61 million persons*.

9

## CLEAR CHANNEL LEVERAGES ITS POSITION IN THE RADIO MARKET TO MONOPOLIZE THE CONCERT PROMOTION MARKET

39. Because of its nationwide dominance in both the radio and concert promotion markets, Clear Channel has the ability to leverage its power in the radio market to extend its power in the concert promotion market – an ability it frequently exercises.

40. Clear Channel has engaged in a variety of predatory and anticompetitive conduct intended to acquire, maintain, and extend monopoly power in the concert ticket market.

41. Clear Channel uses its domination of the radio market to coerce artists to use its concert promotion services by limiting airplay of artists who use a competing concert promotion service. Because of the critical importance of airplay to promoting concert tours, artists playing in many cities are left with little choice but to enter into an agreement with Live Nation.

42. As stated by Jerry Michelson, a partner in Jam Productions, "Clear Channel uses the leverage of their radio stations to intimidate groups to play for them." Because air play and radio promotion is critical to the success of a concert tour, Defendants have been successful in their coercive efforts. For example, according to reports the band "POD" cancelled an exclusive concert in Southern California for a non-Clear Channel station because of a perceived threat that Clear Channel would cut off the band's air time. Another report indicates that two platinum-selling rock bands were pulled from Clear Choice stations *across several states*, not just locally, over concert-promotion disputes.

43. Clear Channel has also denied paid and unpaid advertising time to competing concert promoters through a variety of means.

44. Competing promoters attempting to place paid advertisements on local stations owned by Clear Channel have been charged excessive advertising rates, told that no time is available, or offered only undesirable time slots. Thus, Defendants have sent a clear message to

10

artists that they will use their ability to control the airwaves to their advantage in the concert promotion market.

45. Clear Channel's anticompetitive behavior is not limited to paid advertising, however. Radio stations often "promote" concerts for free, above and beyond the advertising time paid for by the concert promoter, by mentioning the concert on-air, holding ticket giveaways, and conducting interviews with artists. Such promotion benefits the station because, by generating interest in the artist, the station encourages listeners to tune-in to hear more of the artist's music and for concert information. Clear Channel stations have intentionally excluded concerts promoted by competitors from on-air updates of upcoming concerts and other promotions such as contests. In at least one instance, when a competing promoter provided free concert tickets to be given away as part an on-air contest Clear Channel gave the tickets to its employees instead.

46. Clear Channel has also used their power "to squash competition from the independents by offering unprecedented guarantees to artists -- a practice that has led to astronomical ticket prices and rise in 'facility' fees, adding as much as $4 to $5 to the price of a ticket at SFX venues (on top of the $5.50 or so usually charged by Ticketmaster, with which SFX has an exclusive relationship)." Schaprio, Mark, *The Day the Music Died* (July 25, 2000), available at: http://archive.salon.com.

47. After out-bidding its competition by offering unprecedented guarantee to artists, Clear Channel recoups those amounts by increasing ticket prices. In a 2002 article in the New York Times it was reported that Clear Channel purchased the entire Back Street Boys national tour for $100,000,000 and then set "extremely high ticket prices" to recoup the costs. Reportedly, Clear Channel took a similar approach to a Bonnie Raitt concert in Denver where it

11

bid more than double than a Denver-based promoter and sold tickets for well-above the price that the competitor intended to charge.

48.    In some cases, Clear Channel has offered artists more than 100 percent of gross sales. Clear Channel recoups its losses form such tactics by artificially inflating ticket charges and adding ancillary charges.

49.    Through all of these anticompetitive tactics, Defendants have stifled competition in the rock concert promotion market and increased concert ticket prices to the detriment of Plaintiff and the Class.

### THE EFFECTS OF CLEAR CHANNEL'S CONDUCT

50.    Clear Channel's conduct has the purpose and effect of: (1) restraining and preventing competition, (2) creating, maintaining, and expanding its monopoly power, and (3) unreasonably increasing its profits, all at the expense of concert ticket purchasers who are required to pay inflated ticket prices.

51.    According to Pollstar, a leading publisher of concert industry data, from 2003 to 2005, North American gross concert revenues increased from $2.5 billion to $3.1 billion, a compounded annual growth rate of approximately 11%. At the same time, ticket sales for the top 100 tours (representing approximately 67% of total domestic concert ticket revenues) declined by 3.5%.

52.    Similarly, according to Princeton University Economics Professor Alan B. Krueger, U.S. concert ticket prices rose 61 percent from 1997 to 2002, the period during which Clear Channel amassed and solidified its market power, but only 21 percent between 1991 and 1996. By comparison, the consumer price index increased only 13 percent between 1997 and 2002, and 15 percent between 1991 and 1996. Prices for the groups listed in the *Rolling Stone*

*Encyclopedia of Rock and Roll* rose 73 percent between 1997 and 2002. In addition, concert ticket prices increased twice as much as ticket prices for other entertainment, including movies, theatrical performances and sporting events.

53. These artificial ticket price increases are directly attributable to Defendants' unlawful, anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

54. Plaintiff brings this action pursuant to Rule 23(b)(2) and (b)(3) on behalf of himself and the following Class of direct purchasers:

> All persons and entities who purchased tickets to any rock concert in the Massachusetts Region directly from any of the Defendants, their affiliates, predecessors or agents between June 13, 1998 and December 21, 2005. Excluded from the Class are Defendants, their parents, subsidiaries and affiliates.

55. The exact number of Class members is unknown at this time because Defendants have exclusive control of this information. However, Plaintiff has reason to believe, in light of the nature of trade, that the Class members are sufficiently numerous that joinder of all members of the Class is impracticable.

56. Common questions of law and fact exist as to all members of the Class, including the following:

- whether the relevant market consists of the market for concert tickets in the Massachusetts Region;

- whether Defendants unlawfully monopolized, or attempted to monopolize, the relevant market during the Class Period;

- whether Defendants engaged in anticompetitive conduct in furtherance of such an unlawful monopoly;

- whether Defendants' conduct had the effect of substantially lessening competition and/or tended to create a monopoly in the relevant market;

- whether Defendants' unlawful conduct caused Plaintiff and the Class to pay more for rock concert tickets than they otherwise would have paid;

- the appropriate measure of damages incurred by Plaintiff and the other members of the Class; and

- whether Plaintiff and the Class are entitled to declaratory, injunctive and other equitable relief.

57. These and other questions of law and fact are common to the members of the Class and predominate over any questions affecting only individual members.

58. Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff and all members of the Class were injured in the same manner by Defendants' unlawful, anti-competitive and inequitable methods, acts and practices, and wrongful conduct in the conspiracies complained of herein, *i.e.*, they have paid supra-competitive and artificially high prices rock concert tickets.

59. Plaintiff will fairly and adequately protect the interests of all the members of the Class. Plaintiff has retained counsel who are experienced in class action and antitrust litigation, and Plaintiff has no interest in this litigation that is adverse, to or in conflict with, the interests of the other members of the Class.

60. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for claims, which would otherwise be too small to support the expense of individual, complex litigation. Defendants have acted or have refused to act, as alleged herein, on grounds generally applicable to the Class, thereby making appropriate monetary, injunctive and declaratory relief with respect to the Class as a whole.

14

## COUNT I

(Monopolization in Violation of Section 2 of the Sherman Act 15 U.S.C. § 2)

61.     Plaintiff repeats and re-alleges all preceding paragraphs of this Complaint as if fully set forth herein.

62.     The relevant geographic market is the Massachusetts Region, which is the market where purchasers can practically turn for alternative venues for any particular rock concert. The relevant product market is the market for rock concert promotion which includes the right to sell tickets.

63.     Defendants have willfully acquired and maintained monopoly power in the relevant geographic and product market through mergers and acquisitions and other anticompetitive conduct described herein.

64.     There are significant barriers to entry in the concert promotion market, including expertise required, the ability to develop a reputation as a successful promoter, developing relationships with artists, access to concert venues, and access to radio airwaves.

65.     During the Class Period, by the conduct described herein, Defendants engaged in exclusionary, anticompetitive conduct designed to prevent competition in the relevant geographic and product market.

66.     The foregoing acts and conduct by Defendants have prevented or suppressed competition, and continue to prevent or suppress competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

67.     As direct and proximate result of Defendants' monopolistic conduct, competition in the relevant market has been restrained and Plaintiff and the Class have suffered damages and will continue to suffer damages through inflated rock concert ticket prices.

## COUNT II

(Attempted Monopolization in Violation of Section 2 of the Sherman Act 15 U.S.C. § 2)

68. Plaintiff repeats and re-alleges all preceding paragraphs of this Complaint as if fully set forth herein.

69. Defendants engaged in the aforementioned anticompetitive acts and practices with the intent and purpose of preventing and suppressing competition in the market for concert promotion and rock concert ticket sales.

70. At the time Defendants engaged in these acts, there was a dangerous probability that Defendants would obtain monopoly power in the relevant market.

71. Defendants have continued to engage in the unlawful conduct described above to the detriment of Plaintiff and the Class.

72. As direct and proximate result of Defendants' monopolistic conduct, competition in the relevant market has been restrained and Plaintiff and the Class have suffered damages and will continue to suffer damages through inflated rock concert ticket prices.

## COUNT II

(Unjust Enrichment)

73. Plaintiff repeats and re-alleges all preceding paragraphs of this Complaint as if fully set forth herein.

74. As a direct and proximate result of their unlawful conduct, Defendants have benefited from the receipt and retention of profits equal to the amount of overpayment by Plaintiff and the other members of the Class for rock concert tickets sold during the Class Period.

75. It would be unjust and inequitable for Defendants to retain such a benefit, conferred to Defendants by Plaintiff and the members of the Class, to their economic detriment.

76. Defendants should be compelled to disgorge into a constructive trust fund, for the benefit of Plaintiff and the Class, all such overpayments received by Defendants.

77. Plaintiff and the Class have no adequate remedy at law.

## JURY DEMAND

78. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all claims so triable.

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests a judgment as follows:

A. Certifying a Class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for damages, and certifying a Class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for injunctive relief, certifying Plaintiff as the representative of the Class, and designating its counsel as counsel for the Class;

B. Declaring that Defendants have committed the violations alleged herein;

C. Awarding Plaintiff and the Class damages against each Defendant, jointly and severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D. Awarding Plaintiff and the Class their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law;

E. Awarding Plaintiff and the Class pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint, to the extent provided by law;

F.    Permanently enjoining all continuing and future unlawful activity by Defendants in violation of federal antitrust law, pursuant to 15 U.S.C. § 26; and

G.    Awarding Plaintiff and the Class such additional relief as the Court may deem proper.

Dated: June 12, 2006

By: _____
Thomas M. Sobol (BBO# 471770)
Edward Notargiacomo (BBO# 567636)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700

James R. Malone, Jr.
Michael D. Gottsch
Joseph G. Sauder
Timothy N. Mathews
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, PA 19041
(610) 642-8500

Attorneys for Plaintiff and the Class